Thomson, J.
Beplevin by defendant in error against plaintiff in error. Plaintiff had judgment, and defendant brings the ease here by writ of error.
The complaint alleged that on the 10th day of February, 1897, the plaintiff was the owner and lawfully possessed of certain specified goods and chattels of the value of $900, and that on that day the defendant wrongfully took them from his possession. The answer denied the plaintiff’s ownership or possession of the property, or the alleged wrongful taking by the defendant, and averred that on the 13th day of July, 1896, The Farmers’ National Bank of Frankfort, Indiana, recovered a judgment in the circuit court of the United States against one J. B. Hindry for $5,473.33; that on the 27th day of January, 1897, the judgment being unsatisfied, a writ of execution was issued thereon, directed to the defendant as marshal of the district of Colorado, and commanding him as such marshal to make the amount of such judgment, interest and costs, which writ the defendant,- on the 10th day of February, 1897, levied on the property in suit as the property of Hindry; and that, at the time of the levy, Hindry was, and long prior thereto had been, the owner of the property. The replication denied ownership in Hindry.
*202 The following is the testimony of the plaintiff: The ranch of Hindry and that of the plaintiff were adjacent. They were separated by the Platte river. That river was the southern boundary of the plaintiff’s ranch, and the northern boundary of Hindry’s. There was a bridge across the river between the two ranches. The plaintiff bought the property in question in the latter part of January, 1897, for $540, and on that day received a bill of sale for it. At the time of the purchase, the property was on Hindry’s ranch. At that time Hindry told the plaintiff that, as long as he had anything to do with the ranch, he wished the plaintiff to take charge of it. The plaintiff regarded himself as at liberty to take charge of it at once, and used the pasture and buildings. He immediately turned in some stock — both horses and cattle, in the neighborhood of one hundred in all — and had hay from Hindry’s ranch fed to all of the stock together — those purchased from Hindry, and those turned in by him. He took control of the ranch, and the personal property on it, and directed the feeding of the stock. The plaintiff gave Hindry his note for the purchase price. The note and bill of sale were both dated August 1, 1896. They were dated back, because the plaintiff had had a stallion of Hindry’s from the date of the bill of sale, and he preferred paying interest on the note to paying for the services of the stallion. Pour or five head of mules purchased by him were taken over to his own ranch and worked, but afterwards were returned to the Plindry ranch for their care and keep. Hindry’s business was that of contractor on'ditches and railroad grades. His business required the use of heavy teams and scrapers. The levy was made about two weeks after plaintiff’s purchase. Shortly before the levy, Hindry left for -Nebraska with some of the horses. He talked about a contract there. At the time of the plaintiff’s pur *203 chase, a man named Henry was on the Hindry ranch in charge of the property. He had been in Hindry’s employ continuously for a good many years. Plaintiff told him of the purchase of the Hindry stock, and instructed him how to handle it, and also instructed him to feed all the stock from the Hindry hay then stacked on the ranch. He did not hire Mr. Henry, or anybody. At Hindry’s request he paid money to •Henry on account of his indebtedness to Plindry; but, on his own account, he never hired Henry, or ■paid him wages. Plaintiff made no change in location of the tools and machinery he purchased, and did not move the hay except as it was fed to- the stock. He visited the ranch daily, generally in the morning, and sometimes in the afternoon. Hindry had owned his ranch during all the time plaintiff had lived on his, which was about ten years. Hindry was not accustomed to living on his ranch much of the time.
Prom the other evidence adduced by the plaintiff it appeared that after the transaction between Hindry and the plaintiff, the former left the ranch with a carload of horses,, and a general grading outfit ; that the officer making the levy was informed at the time that the plaintiff claimed the property, and claimed to have a hill of sale for it; that after the purchase, some of the Plindry horses were taken by the plaintiff over to his own place; that Henry kept on feeding the Hindry horses the same as ever, hut fed the plaintiff’s stock too; that the’stallion was kept all the time in the same place, and the Hindry horses kept separate from the plaintiff’s horses,-remaining in the same corral they occupied before, and that the machinery and tools remained where they had always been. Mr. Craig, an employee of the plaintiff on his own ranch, was asked this question: “Was it generally known in the community that Mr. *204 Day had bought the Hindry property?” To which he made answer, “It was known.”
The plaintiff, as evidence of his title, introduced the bill of sale executed to him by Hindry at the time of the transaction between them, although antedated. It hardly supports his claim. It recites a consideration of $540 — the exact sum testified to by the plaintiff — but, otherwise, it differs from his statements in his affidavit. By that paper he claims ownership of twenty-seven head of horses, brood mares and' colts; whereas the bill of sale purports to transfer to him nineteen head of mares and colts, and no horses. He therefore claims eight animals more than, according to his bill of sale, he bought. Again, the bill of sale gives him one mowing machine, but he sued for three; and he wants seventy-five tons of alfalfa hay, when his written title gives him the right to forty, and no more. Finally, in the list set forth in his affidavit, is included one lot of blacksmith tools ; but, referring to his bill of sale, we find that he bought no blacksmith tools at all. That instrument was his own evidence. He introduced it to.prove his purchase, and he is bound by it. According to it, he paid $540 for the articles it enumerates; and, according to his testimony, he paid the same sum for all the articles to which he lays claim. The paper and the testimony can be reconciled only on the supposition that Hindry was so anxious to give the plaintiff good measure, that he threw in eight horses, two mowing machines, thirty-five tons of alfalfa hay, and all his blacksmith tools, without extra charge. If a different line of defense from that relied on had been chosen, the discrepancy between the statement of the transaction, written at the time, and the affidavit and testimony of the plaintiff, might suggest questions which he would experience some difficulty in answering.
However, the sole defense sought to be inter *205 posed is that, as against creditors of the vendor, there was no sale, because theré was no such immediate delivery, followed by such actual and continued change of possession as would satisfy the requirements of the statute of frauds. The plaintiff argues that such defense is not available to this defendant, for the reason that he did not plead it in his answer. Outside of the justification, the answer was simply a denial of the title alleged by the plaintiff. In support of his contention the plaintiff has referred us to a number of Colorado cases, holding, in conformity with the general current of authority, that if the defendant relies on the fraudulent conduct of the plaintiff to defeat the latter’s claim, or establish his own title, the facts constituting the supposed fraud must be set forth in his answer. “Fraud, as a defense,” says Mr. Bliss, “is sustained by affirmative facts which do not contradict, but avoid, the legal effect of the facts stated by the plaintiff.” — Bliss on Code Pleading, § 329. The rule is thus stated by Mr. Justice Elliott, in De Votie v. McGerr, 15 Colo. 467: “Where the defendant’s claim of title springs out of, or rests upon, the alleged fraud or fraudulent conduct of the plaintiff, so that but for the fraud, the title of the plaintiff would be good, such fraud, being the source and foundation of the defendant’s claim, is essentially new matter, and must be pleaded or it cannot be proved.” If, for example, in this case, all the requirements of the statute as to the delivery and change of possession had been complied with, but the defendant sought to overthrow the sale on the ground that it was made with the intent to defraud creditors of the vendor, justice, as well as the rule, would require that the vendee be advised of the charge, and given an opportunity to meet it, and that the fraud should not be proved unless it was pleaded. Proof by the'plaintiff of the purchase, and of the de *206 ■livery and change of possession rendered necessary by the statute, would have made a prima facie case; and actual fraud infecting the transaction, would be matter of affirmative defense.
The case at bar presents no such situation. Where title is the result of a concurrence of certain facts, the facts must be proved to establish the title. The allegation of title involves the allegation of the facts, and a denial of the title includes a denial of the facts. To prove the title, the plaintiff must prove the existence of the facts on which it depends; and if, under a naked allegation of title, he may prove those facts, then the defendant, under a naked denial of title, may disprove them. Evidence of those facts establishes the title, and contradiction of those facts overthrows it. This plaintiff, in order to maintain his title as against the defendant, undertook to show, first, the purchase from Hindry; second, the immediate delivery of the property to him, and, third, its continued possession in him afterwards. If he established the facts of purchase, delivery and possession, he proved his title; if he failed in proof of either of those facts, he failed in proof of his title; but if his evidence made a prima facie case in his favor, the defendant had, under his general denial, the right to show its falsity.— Andrews v. Bond, 16 Barb. 633; Kennedy v. Shaw, 38 Ind. 474; Aultman v. Stitchler, 21 Neb. 72; Nedd v. Thompson, 34 Calif. 39; Young v. Glascock, 79 Mo. 344.
In a suit between the immediate parties, on a contract for the sale of personal property, if the defendant claims exemption from liability on the ground that the price for which the property was sold was more than fifty dollars, and that- there was no memorandum of the sale in writing, and no acceptance or receipt of any part of the goods by the buyer, there is no hardship in exacting from him a special answer *207 of the facts which bring the contract within the statute of frauds, because they are within his personal knowledge; but, in an action of replevin, where the complaint contains only a general allegation of title, and furnishes no hint as to what the proof will be, to require the defendant, — a stranger to the transaction on which the plaintiff, at the trial, will base his claim, —in order that he may make a special defense, to guess the facts which would invalidate the title, and, at his peril, to guess them right, would, if not always, at least in many instances, work grave injustice.
There is no decision in this state which requires a defendant in replevin to plead the statute of frauds; and we have been referred to but one from the outside, in which counsel’s contention finds any support. The case of Bickle v. Irvine, 9 Mont. 251, was replevin. The complaint, as in the case at bar, alleged simply that the plaintiff was the owner and entitled to the possession of the property. The answer, like the one here, denied the allegation, and justified under a writ of attachment issued to the defendant, as sheriff. The defendant offered to show by the cross-examination of the plaintiff’s vendor, that after the sale by him to the plaintiff, he (the vendor) remained in “continuous and open possession and control of the property.” The court, after saying that the transcript was imperfect and failed to show the direct testimony of the witness, proceeded to decide, as an abstract proposition, that the proposed evidence could not be introduced under a general denial. Of course, we do not know what the ruling would have been if the transcript had been perfect; but in so far as the opinion holds that in that ease a special plea of the statute of frauds was necessary, it receives no countenance from a single one of the cases cited in its support, and the reasoning in one (Feeney v. Howard, 79 Calif. 525) is in diametric op *208 position to it. So far as we know, it stands alone. It has neither principle nor authority in its favor, and we must decline to regard the decision as a precedent.
Whether, upon the whole evidence, there was such compliance with the statute as to constitute a sale good against creditors, may well he doubted. For the defendant, the question was raised below, and it is raised here; but, inasmuch as there must be a retrial, we think a discussion of it unnecessary. The court, in its submission of the ease to the jury, misdirected them. Over the objection of the defendant, it gave them the following instruction:
“The court instructs the jury that there is no question of fraud or bad faith on the part of the plaintiff Day made by the pleadings in this case, and you have, therefore, nothing to consider as to this. But the important and controlling question is, whether the plaintiff Day was, in fact, the owner of, and in possession of, the property in question at the time of the levy of the execution on the same by the defendant, J. A. Israel, for The Farmers’ National Bank of Frankfort, Indiana, as alleged in the answer, or whether the property was then the property of J. B. Hindry and in his possession. If you find from the evidence the property was that of plaintiff, your verdict should be for the plaintiff, and in such case it is your duty to assess the amount of damages sustained by him on account of the levy. ’*’
If nothing worse, the foregoing instruction was misleading. The theory of both parties was that the plaintiff had bought the property from its owner, and had paid for it. Upon this theory the plaintiff became, as against Hindry, invested with the title. The question was not whether as between the plaintiff and Hindry, the former owned the property, but whether, as against the defendant, the sale was ef *209 fectual. The jury were simply asked to say whether the plaintiff or Hindry owned the property. The distinction between a title good as against all the world, and a title good as between the parties, but invalid as against creditors, was not pointed out; and the jury may well have thought that the title which the plaintiff acquired by his purchase, regardless of any question concerning delivery and change of possession, was sufficient to warrant a verdict in his favor. Nor were the defects supplied by any other instruction. The following was probably relied on to prevent a misunderstanding:
“The court instructs the jury that the change of possession required on a sale of personal property to make the same valid as against creditors of the seller, must be an open, notorious and visible change, such as to apprise the community, or those accustomed to deal with the seller, that the property has changed hands, and that the title has passed out of the seller into the purchaser. To constitute a visible and actual change of possession it is not necessary that the property be actually moved from one locality to another, if the buyer does such acts as make visible signs of his ownership, and maintains that relation to the property purchased which owners of property generally sustain to their own property. ’ ’ If the foregoing were, even abstractly, a correct statement of the law, it would hardly cure the vice with which the instruction we have been discussing is infected. But it is not correct. The statute requires that the sale be accompanied by immediate delivery, and followed by an actual and continued change of possession. If the evidence showed a delivery at all, it left the time when it took place in uncertainty. Whether it accompanied the sale, or was made some time after-wards, is, at least, doubtful; and it is by no means certain that the plaintiff ever took possession, ex *210 cept symbolically, of a considerable portion of the property. The question of immediate delivery, or actual or continued change of possession, was not submitted. The change which the court described, was not necessarily an actual change. It was said that it must be open, notorious and visible; but it was also said that the property need not be moved or disturbed if the buyer would do such acts as would make visible signs of his ownership, and would maintain that relation to the property purchased which owners of property sustained to their own property. What acts should be done, the court left to conjecture. In Cook v. Mann, 6 Colo, 21, Justice Elbert made the acts consist in the employment of the usual indicia of ownership. The indicia of ownership are necessarily different in different cases. Chattels capable of manual delivery and removal must be removed by the purchaser and taken into his custody. Said Chief Justice Beck in Bassinger v. Spangler, 9 Colo. 179: “The statute is plain, positive and peremptory. It admits of no excuse for leaving personal chattels, capable of manual delivery and removal, in the apparent possession of the vendor. ” See also Atchison v. Graham, 14 Colo. 217.
But where the subject of the sale does not reasonably admit of an actual delivery, the purchaser must manifest his ownership by some other act, and what that shall be is dependent upon the character of the property. Delivery of a stock of goods in a store, and of a stack of hay in a field, would be made differently, and the indicia of ownership in the two cases would not be the same; but the acts of possession must be unmistakable; they must be such as to apprise the community that the title has changed.— Lay v. Neville, 25 Calif. 546; Cook v. Mann, supra.
The question of the sufficiency of the indicia of ownership in this case was not submitted by the in *211 strnetion. The court told the jury that such acts must have been done by the buyer as would make visible signs of ownership, and that he must maintain that relation to this property which owners generally sustain to theirs. The plaintiff went over to the Hindry ranch every day, and had his cattle fed from stacks of hay standing on that ranch. Without explanation of what the court meant by acts which “make visible signs of ownership,” the jury may have thought that the plaintiff’s daily trips and his appropriation of hay, were acts which constituted visible signs of ownership and evidenced the •required relation of the purchaser to the property. Those acts were certainly not inconsistent with ownership, and were entirely visible, but alone they were not sufficient to satisfy the requirements of the statute.
Aside from the erroneous character of this instruction, its language was so general and indefinite that the jury could hardly regard it as a qualification or explanation of the other instruction, which told them that the controlling question was, whether the plaintiff, having bought the property from Hindry and paid him for it, was its owner, or whether Hindry, having sold the property to the plaintiff, and received the purchase price, was its owner. Reading the plain language of that instruction, and without advice that its apparent meaning was not its real meaning, the jury probably returned a speedy verdict.
The defendant sought to avoid the effect of the instruction we have reviewed by asking the court for others correctly applying the law to the facts, but his requests were refused. "Whether, if they had been given, they would have made the instructions good *212 as a whole is doubtful, and the result of the trial would probably have been the same that it was. The judgment is reversed. Reversed.